UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIVERSIFIED TECHNOLOGY CONSULTANTS, INC. | ) ) | 3:21-CV-00616 (KAD) |
| *Plaintiff*, | ) ) | |
| v. | ) ) | |
| CITY OF BRIDGEPORT | ) | JULY 5, 2023 |
| *Defendant*. | ) | |

**MEMORANDUM OF DECISION**
**RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 55)**

Kari A. Dooley, United States District Judge:

This action arises out of the termination by Defendant, City of Bridgeport ("Defendant" or "the City") of a contract it had with Plaintiff, Diversified Technology Consultants, Inc. ("DTC" or "Plaintiff"). In its original complaint, Plaintiff identified several claims under 42 U.S.C. Section 1983—specifically that Defendant's termination of the contract violated the Equal Protection Clause[1] and the Contracts Clause of the United States Constitution. Pending before the Court is Defendant's motion for summary judgment as to all claims. In Plaintiff's opposition to Defendant's motion for summary judgment, it abandoned its residency and Contracts Clause claims in favor of the Equal Protection claim premised upon race and ethnicity. *See* Pl. Opp., ECF No. 65, at 2. The Court has reviewed all the parties' submissions, and for the following reasons, the motion for summary judgment is GRANTED.

**Factual Allegations**

The following facts derive from Defendant's Local Rule 56(a)(1) Statement of Material Facts ("Def. LRS," ECF No. 55-5), Plaintiff's response thereto ("Pl. LRS," ECF No. 65-1), and

---

[1] The Equal Protection claims were premised on the race/ethnicity of Plaintiff's owner as well as the residency of the Plaintiff in Florida.

the parties' exhibits. The facts set forth by Defendant are admitted by Plaintiff unless otherwise indicated.

Plaintiff is a corporation with offices in Connecticut and Florida. *See* Def. LRS at ¶ 1. It is an Asian Pacific American and Pacific Islander minority owned enterprise ("MBE"), as certified by the state of Connecticut. *See id.* at ¶ 3. Defendant is a municipality in the state of Connecticut. *See id.* at ¶ 2. In 2013, Plaintiff entered into a Master Consultant Agreement with Perkins Eastman, Architects, P.C., which established terms and conditions for performance of services by Plaintiff if it were retained by the firm as a subconsultant. *See id.* at ¶ 6–7. Joseph Costa is one of the principals of Perkins Eastman. *See id.* at ¶ 8. In 2018, Defendant chose Perkins Eastman to provide architectural and engineering design work and consulting services for the Bassick High School project ("the Project"). *See id.* at ¶ 9. On July 21, 2018, Perkins Eastman and Defendant entered into a Professional Architectural Services Agreement, which established that the firm's in-house staff and outside consultants would provide architectural and engineering designs for the Project. *See id.* at ¶ 10. Defendant also employed Larry Schilling, a consultant who served as a program manager for school renovations and construction projects, and Michelle Otero, who served as the School Construction Program Manager and Contract Compliance Officer. *See id.* at ¶ 11–12. The cost proposal submitted to Defendant by Perkins Eastman noted that Plaintiff, as a consultant, would be providing structural, mechanical/plumbing/fire protection ("MEP") and civil engineering services for the Project. *See id.* at ¶¶ 16, 19. Plaintiff designated certain staff to perform work on the Project, all of whom were based in Plaintiff's Hamden, Connecticut office. *See id.* at ¶ 20.

Early in 2020, Defendant updated the scope of the Project from "like-new" renovation to construction of a brand new school. *See id.* at ¶ 21. It entered into a purchase and sale agreement

with the University of Bridgeport to purchase real estate to use as the site of the new Bassick High School building. *See id.* at ¶ 23. The Project had many complexities, including a strict design schedule requiring coordination among the engineering design teams, the architect, the City's program managers, the construction manager, and other Project team members. *See id.* at ¶ 27.

In September of 2020, Mr. Schilling, while attending a meeting regarding a different school project, learned that Plaintiff had reduced staff at the Hamden office and was switching to a Florida-based team for the MEP work on the Project.[2] *See id.* at ¶ 32. In response to concerns raised by Defendant, Shay Atluru, Plaintiff's President and CEO, sent resumes of the staff members who were going to be performing the MEP services for the Project. *See id.* at ¶¶ 35–36. Of the eight individuals identified, six worked out of Plaintiff's Sarasota, Florida office. *See id.* at ¶ 37. Generally, Mr. Schilling and Ms. Otero have personal preferences for in-person meetings, as they believe them to be more efficient and productive, especially on complex projects. *See id.* at ¶ 40; 46. And although denied by Plaintiff, Mr. Schilling and Ms. Otero had concerns that an MEP team located approximately 1,200 miles from the project site could cause future problems.[3] *See id.* at ¶¶ 42, 45. And that it would be difficult for the MEP staff to attend in-person meetings in Connecticut. *See id.* at ¶ 48. For this reason, Mr. Schilling determined that Plaintiff should be replaced as the provider of MEP design services on the Project.[4] *See id.* at ¶ 49.

---

[2] Plaintiff objects to this assertion as inadmissible hearsay from an unidentified source.

[3] The parties dispute whether Mr. Costa of Perkins Eastman had similar concerns about Plaintiff's ability to service the Project based on many of the team members' location in Florida. *See id.* at ¶ 52; *see* Plaintiff's Local Rule Statement ("LRS"), ECF No. 65-1, at ¶ 52.

[4] As written in Defendant's LRS, the statement reads: "Therefore, he decided that DTC as the subconsultant that would provide MEP engineering design services." The Court presumes this is a typographical error and should read: "Therefore, he decided that DTC *would not be* the subconsultant that would provide MEP engineering design services." Plaintiff denies this assertion because it does not make grammatical sense. *See* Pl. LRS at ¶ 49.

Additionally, Cory Attra, the structural engineer Plaintiff assigned to the Project, had no prior experience with projects close to the size, magnitude, or complexity of the Project. *See id.* at ¶¶ 53–54. For that reason, Mr. Schilling determined that Plaintiff should be replaced as the provider of structural engineering design for the Project, and Ms. Otero agreed. *See id.* at ¶ 55, 59.

Mr. Schilling sent an email to Mr. Costa on October 29, 2020, alerting him that Plaintiff should be removed as the subcontractor for MEP and structural engineering services for the Project but kept as the subcontractor for the civil engineering services. *See id.* at ¶ 62. The email cited that Plaintiff's team, including the lead mechanical and electrical designers, were "located in Florida." It further cited a concern that the structural team member's resume did not reflect experience on any projects "equal to the structural requirements of the Bassick project." *See id.* Mr. Costa, that same day, notified Plaintiff of its termination of the MEP and structural engineering design work portions of their contract. *See id.* at ¶¶ 63–64. Defendant asserts that Plaintiff's status as a minority-owned business comprised of Asian and Pacific Islander employees did not affect Mr. Schilling's decision to terminate Plaintiff as the MEP engineering subconsultant on the Project. *See id.* at ¶ 57. Plaintiff disagrees. *See* Pl. LRS at ¶ 57.

Perkins Eastman replaced Plaintiff for the MEP design work with Kohler Ronan, a firm located in Danbury, Connecticut, and for the structural design work with a firm in New Haven, Connecticut.[5] *See id.* at ¶ 66. Plaintiff alleges that its replacement is "Caucasian" and the parties do not dispute that Kohler Ronan is not a minority-owned business. *See* Pl. LRS at ¶ 41; page 9 ¶ 25.

---

[5] The Court takes judicial notice of the fact that the distance between Danbury and Bridgeport is roughly 30 miles, and the distance between New Haven and Bridgeport is roughly 20 miles. *See Brisco v. Ercole*, 565 F.3d 80, 83 n.2 (2d Cir. 2009) (taking judicial notice of distance as reported by online maps); *see also United States v. Melhuish*, 6 F. 4th 380, 388 (2d Cir. 2021) (same).

**Standard of Review**

The standard under which courts review motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).

**Discussion**

Plaintiff's sole remaining claim is a 42 U.S.C. Section 1983 claim of race and ethnicity discrimination, as barred by the Equal Protection Clause of the United States Constitution. In seeking summary judgment, Defendant argues that there is no genuine issue of material fact that Plaintiff cannot establish municipal liability under *Monell*. Alternatively, Defendant asserts that the record is utterly bereft of any evidence that Defendant's termination from a portion of its contract was racially motivated. Plaintiff contests both conclusions. The Court agrees with Defendant as to the former argument and therefore does not reach the latter argument.

*Municipality Liability*

In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (internal quotation marks and citation omitted).

Claims against municipalities are considered under the standard established in *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court determined that "[l]ocal governing bodies…can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where…the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. The Court first held that municipalities were "persons" within the meaning of § 1983. It then found that the language of § 1983, which provides that "[e]very person who…subjects, or causes to be subjected, any…person…to the deprivation of rights…secured by the Constitution…shall be liable to the party injured," requires a causal connection between the actions of the municipality itself and the alleged constitutional violation. *See Monell,* 436 U.S. at 691–92. "**Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees.**" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (emphasis added).

Significant here, a "municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under [Section 1983] on a

6

*respondeat superior* theory." *Monell* 436 U.S. at 691 (emphasis in original). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section 1983]." *Id*. at 694. When a plaintiff relies upon a city employee's single tortious decision, the court's inquiry focuses on whether the "actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty Am.* 361 F.3d at 126. Such an action provides a basis for municipal liability where it is "taken by, or is attributable to, one of the city's authorized policymakers." *Id*. In other words, "municipal liability under [Section 1983] attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). *See also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122–23 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.") Finally, a municipal policy cannot generally be gleaned from a single incident. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy[.]").

Here, Plaintiff makes no claim that the decision to terminate a portion of its contract was the result of a policy, practice or custom of the City of Bridgeport to discriminate against MBE subcontractors. Nor, unsurprisingly, is there any evidence of such a policy, practice or custom. Rather, Plaintiff alleges a single instance of discrimination by Mr. Schilling in deciding to terminate aspects of Plaintiff's contract. Plaintiff argues that "[b]ecause the City did delegate to

7

Mr. Schilling the authority to terminate the plaintiff, and – significantly – because the City did not retain any power to review his decision, he was the final policymaking authority in this case." Pl. Opp. Mem., ECF No. 65, at 11. The Court disagrees and concludes that the law does not support this argument. Indeed, taken to its logical end, any City employee who is vested with final decision making authority within the context of their jobs would be transformed into a policymaker for purposes of *Monell* liability.

Rather, this case represents a straightforward effort to establish municipal liability through the doctrine of *respondeat superior*. The allegations arise out of single incident resulting from a single decision made by a single individual. And there is simply no evidence from which a jury might conclude that Mr. Schilling was "responsible for making policy in th[e applicable] area of the municipality's business." *See Jeffes*, 208 F.3d at 57; *see also Agosto v. New York City Dep't of Ed.*, 982 F.3d 86, 100 (2d Cir. 2020) (equating a final decisionmaker with a final policymaker…would effectively impose *respondeat superior* liability—making the municipality liable for the conduct of its employees—in violation of *Monell* itself). Further, a municipality's "going along with discretionary decisions made by [its] subordinates…is not a delegation to the employee of the authority to make policy." *Id.* at 130; *see also Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) ("Authority to make a final decision need not imply authority to establish rules."); *Amnesty Am.,* 361 F.3d at 126 ("[A]llowing the municipality to be held liable on the basis of the mere delegation of authority by a policymaking official would result in *respondeat superior* liability."). Therefore, a plaintiff relying upon delegated authority must establish that the authorized policy makers approved the employee's decision "and the basis for it." *Amnesty Am.*, 361 F.3d at 126 (quotations and citation omitted).

Mr. Schilling was Defendant's employee or agent, and the evidence is not in dispute as to his role in the Project. And while he may have been given decision making authority in the management of the Project, that alone does not transform him into a policymaker for the City of Bridgeport with respect to the City's contracts, their execution, performance or, as here, their termination. *See, e.g., Agosto,* 982 F.3d at 100.; *Hardy v. Town of Greenwich*, No. 3:06cv833 (MRK), 2009 WL 2176117, at *4 (D. Conn. July 22, 2009) (concluding that the Chief of police, who had broad discretion over the appointment of officers to specialized units, did not exercise final policymaking authority). *See also Dingwell v. Cossette*, 327 F. Supp. 3d 462, 475 (D. Conn. 2018) (Chief of Police was "policymaker" when ordering Plaintiff's posts to police department website removed in violation of the First Amendment, where the municipality had not yet established policies for the maintenance of its website and the ultimate decision maker regarding content, without any town policy, was the Chief of Police.) Nor has there been put forth any evidence or argument that his allegedly discriminatory decision to terminate a portion of Plaintiff's contract was known to and approved by City officials. *See Amnesty Am.*, 361 F.3d at 126. For these reasons, Plaintiff has not presented evidence to establish a genuine issue of material fact as to whether the City may be liable under *Monell* for the acts of Mr. Schilling, and the City's motion for summary judgment is granted.

The Defendant argues in the alternative that summary judgment is warranted on the merits of Plaintiff's Equal Protection claim. As noted above, Plaintiff marshals the evidence gathered to date and argues that this evidence supports the inference that Mr. Schilling's decision to terminate Plaintiff from a portion of the contract was motivated by racial animus. Defendant, however, largely relies upon the distinctions between Plaintiff and its identified comparators as defeating any claim of intentional discrimination. As the Court has determined that Plaintiff

cannot establish *Monell* liability against the City, the Court need not reach the merits of Plaintiff's Equal Protection claim.

**Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 55) is GRANTED. The Clerk of Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 5th day of July 2023.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE